## MAINTENANCE OF WORK HOUSES AND LIABILITY TO PRISONERS WHO SUFFER IN HEALTH.

[Circuit Court of Lucas County.]

FRED ROSE V. THE CITY OF TOLEDO AND FRED RITTER.

Decided, February 23, 1903.

*City Work House—Governmental as Distinguished from Corporate Powers of a City—Powers of Officers of Penal Institutions to Make Reasonable Regulations.*

1. A municipality constructs and maintains a work house by virtue of the governmental as distinguished from the corporate power with which it is vested, and is therefore not liable to a prisoner confined therein, who complains that he suffered in health by being placed in a small, damp and unsanitary dungeon.

2. It is a power inherent in a work house superintendent to prescribe reasonable rules for the government of the prison, and to enforce obedience to them by the infliction of proper punishment, and where the punishment is not cruel or excessive, and is not inflicted with malice or intent to injure, the superintendent is not liable to a prisoner suffering injury therefrom.

HULL, J.; HAYNES, J., and PARKER, J., concur.

A petition in error was filed in this court to reverse the judgment of the court of common pleas. The plaintiff in error was the plaintiff below and filed a petition against the defendants for damages claimed to have been sustained by reason of his treatment in the work house of the city of Toledo, claiming damages against both the city and the other defendant, Fred Ritter, who was superintendent of the work house at the time of the grievances complained of. A general demurrer was filed to the petition in the court below and was sustained. The plaintiff not desiring to plead further, the petition was dismissed at plaintiff's cost.

The question here is, Whether the petition states a cause of action against either of the defendants? The petition is as follows:

"Plaintiff says that the defendant, the City of Toledo, is a corporation duly incorporated under the laws of Ohio, and a city of the third class and first grade, and that defendant, Frederick Ritter, is superintendent of the Toledo work house in the City of Toledo, Lucas county, Ohio.

"Plaintiff, Fred Rose, further states that the City of Toledo, Ohio, did on or about (exact date to plaintiff unknown) build and construct a building and enclosed, a parcel of land between Swan creek and the canal within the corporated limits of the City of Toledo, and called it The Toledo Work House.

"That within said enclosure and buildings there was constructed and still remains a dungeon.

"That said dungeon was constructed and is maintained by said City of Toledo in the condition existing at the time hereinafter mentioned.

"That at the time hereinafter mentioned the City of Toledo, the said defendant, knew or by reasonable diligence might have known of the dangerous, unhealthy, unsanitary and damp condition of the said dungeon, as aforesaid.

"Knew that said dungeon was constructed and made so narrow and small that a person confined therein could not lie down.

"That the said City of Toledo, defendant, by some agreement with the Commissioners of Lucas County, Ohio, agrees to keep prisoners, convicted of misdemeanor within said county of Lucas within said work house, at labor during their confinement therein.

"Plaintiff further says that on the 12th day of April, 1901, he was adjudged guilty of a misdemeanor in the Police Court in the said City of Toledo, and by the judge thereof ordered committed to said work house for four months, and in pursuance of said order and judgment of said court he was duly committed to said work house, kept and maintained by the defendant, the City of Toledo, and superintended by Frederick Ritter, the said defendant.

"That on or about the —— days of 1901 (exact date to plaintiff unknown) while serving time for said offense in said work house, he was, without due process of law and without reasonable cause committed to said dungeon by order of Frederick Ritter, said defendant, and there confined for 48 hours at one time without nourishment; that within a few days thereafter was again committed to said dungeon, as aforesaid, and remained therein 48 hours without food; that after being released and within ten days thereafter, he was again committed to said dungeon and compelled to remain therein continuously for 144 hours.

"That said dungeon was in an unhealthy and unsanitary condition; that by reason of the premises herein alleged plaintiff be-

came, and was sick; that ever since he was so confined in said dungeon and on account of the damp, unsanitary and unnatural position he was compelled to occupy, and by reason of the infective and dangerous condition of said dungeon and dampness therein, he was injured and caused great bodily pain, causing rheumatism and other internal injuries.

"That he was deprived of his rights in the premises; that said defendant, Fred Ritter, knew, or by reasonable diligence might have known of the aforesaid condition of said dungeon, and in total disregard of his duties to this plaintiff did order his commitment to said dungeon as aforesaid.

"That the injuries then and there received are of a permanent nature from which he has suffered and still suffers great bodily pain and mental anguish.

"That ever since the said grievances as heretofore stated plaintiff has been and still is unable to perform manual labor.

"That by reason thereof in the premises plaintiff has been damaged in the sum of five thousand dollars.

"Wherefore plaintiff prays judgment for five thousand dollars and his costs." (Signed and sworn to in due form.)

The action was sought to be maintained both against the City of Toledo and Ritter, the superintendent. Their liability or want of liability, as the case may be, rests upon somewhat different grounds so that they will be considered separately. It appears from the allegations of the petition and the matters that are not alleged in the petition—for it is presumed that all things were done lawfully unless the contrary is shown—that the City of Toledo in the exercise of its powers under the law constructed and maintained a work house for the imprisonment and correction of violators of law—violators of the city ordinances, probably, primarily—and that it had an arrangement under which persons who were convicted of misdemeanors—violators of the state laws—might be committed to said work house and imprisoned therein instead of being imprisoned in the county jail. The plaintiff was duly convicted of some offense against the laws of the state, of a misdemeanor, as he alleges, in the police court, and was duly and legally sentenced to imprisonment for four months in the Toledo work house. He makes no complaint of the legality of the proceedings up to this time. He was, then, at the time of the grievances of which he complains a lawful prisoner who had

been duly committed to the work house and confined therein.

According to the petition there was in the work house a "dungeon," which we may presume was used for the punishment by imprisonment therein of the inmates of the work house for violation of the rules of the work house, the work house being in its nature a prison, and standing substantially on the same footing as other prisons. This dungeon, he alleges, at the time of his commitment thereto was in an unsanitary and unhealthy condition; that it was damp and otherwise unhealthy and that on account of his confinement therein for the periods mentioned by him, his health was injured.

The question arises, first: As to whether the city is liable in this action—whether the facts in the petition are sufficient to constitute a liability against the city?

It is not for every wrong that is committed by an agent or employe of the city that the city is liable in damages to a private citizen; some of the duties of the city are of a public character—of a governmental character, the city exercising the powers of government, or of sovereignty, as it is said; and while exercising such governmental powers as a general rule the city is not liable for the wrongful acts of its agents and employes in carrying out or in performing such powers. The city, in the performance of such duties, acts not for the individual but for the public, acts in a governmental capacity for the benefit of the people. The work house is constructed and maintained not for the benefit and pleasure of those who may be so unfortunate as to be committed to it and confined therein, but it is constructed and maintained under the laws of the state for a public purpose, as one of the institutions of government for the imprisonment of wrong doers, and they are confined therein for correction and punishment—as the penitentiary at Columbus is constructed and maintained for similar purposes. These principles are sustained by numerous authorities. A case in 12 Ohio St., 375 (*Western College* v. *City of Cleveland*), in which the court say in the syllabus:

"The act to incorporate the city of Cleveland, passed in 1836, provided, among other things, in reference to the city council—'it shall be their duty to regulate the police of the city, preserve

the peace, prevent disturbances, and disorderly assemblages.'
*Held*: That the duty intended was that properly appertaining
to an administrative and legislative body, acting in the govern-
ment of a city—making regulations, by-laws and ordinances for
the purposes specified, to be enforced by the appointment of offi-
cers; and that neither on general principles nor from the effect
of that enactment is the city of Cleveland responsible for the
destruction of property by a riotous assemblage of persons, or for
the neglect of the officers in not preserving the peace, and prevent-
ing such destruction."

On page 377, in the opinion delivered by Judge Gholson, he
says:

"It is obvious that there is a distinction between those powers
delegated to municipal corporations to preserve the peace and
protect persons and property, whether to be exercised by legisla-
tion or the appointment of proper officers, and those powers and
privileges which are to be exercised for the improvement of the
territory comprised within the limits of the corporation, and its
adaptation to the purposes of residence or business. As to the
first, the municipal corporation represents the state—discharging
duties incumbent on the state; as to the second, the municipal
corporation represents the pecuniary and proprietary interests of
individuals. As to the first, responsibility for acts done, or
omitted, is governed by the same rule of responsibility which
applies to like delegations of power; as to the second, the rules
which govern the responsibility of individuals are properly appli-
cable."

In the 19th Ohio St., at page 19 (*Wheeler* v. *The City of Cin-
cinnati*), the Supreme Court say in the syllabus:

"The power conferred by the statute on cities of this state to
organize and regulate fire companies, and provide engines, etc.,
for extinguishing fires, is, in its nature legislative and govern-
mental; and a city is not liable to individuals for damage resulting
from a failure to provide the necessary agencies for extinguishing
fires or from the negligence of officers or other persons connected
with the fire department."

On page 22 of the opinion the court say:

"Nor is it liable for a neglect of duty on the part of fire com-
panies, or their officers, charged with the duty of extinguishing

fires. The power of the city over the subject is that of a delegated quasi-sovereignty, which excludes responsibility to individuals for the neglect or non-feasance of an officer or agent charged with the performance of duties."

A city is liable for the negligent performance of duties properly within its corporate power, such as keeping the streets in repair and other matters of a kindred nature, and a distinction is made between duties of that kind and those of government or sovereignty. A discussion of this question is found in Cooley on Torts, beginning at page 619 and continuing through pages 620, 621 and the following pages. Judge Cooley says on page 620:

"For taking or neglecting to take strictly governmental action, municipal corporations are under no responsibility whatever except the political responsibility to their corporators and to the state. The reason is this: That it is inconsistent with the nature of their powers that they should be compelled to respond to individuals in damages for the manner of their exercise. They are conferred for public purposes, to be exercised within prescribed limits, at discretion, for the public good; and there can be no appeal from the judgment of the proper municipal authorities to the judgment of courts and juries."

The question is discussed at length in Dillon on Municipal Corporations, Vol. 2 (2d Ed.), in Sections 771 and following, where the law is laid down in language similar to that employed by Judge Cooley.

Judge Dillon says in Section 773:

"Agreeably to the principles just mentioned, police officers appointed by a city are not its agents or servants so as to render it responsible for their unlawful or negligent acts in the discharge of their duties; and, accordingly, a city is not liable for an assault and battery committed by its police officers, though done in an attempt to enforce an ordinance of the city; nor for an arrest made by them which is illegal for want of a warrant; nor for their unlawful acts of violence whereby, in the exercise of their duty of suppressing an unlawful assemblage of slaves, the plaintiff's slave was killed."

And in Section 774:

"So, although a municipal corporation has power to extinguish fires; to establish a fire department; to appoint and remove its officers, and to make regulations in respect to their government, and the management of fires, it is not liable for the negligence of firemen appointed and paid by it, who, when engaged in their line of duty, upon an alarm of fire, ran over the plaintiff in drawing a hose reel belonging to the city on their way to the fire; nor for injuries to the plaintiff caused by the bursting of a hose of one of the engines of the corporation through the negligence of a member of the fire department. The exemption from liability is placed upon the ground that the service is performed by the corporation in obedience to an act of the Legislature; is one in which the corporation has no particular interest and from which it derives no special benefit in its corporate capacity; that the members of the fire department, although appointed by the city corporation, are not the agents and servants of the city for whose conduct it is liable; but they act rather as officers of the city, charged with a public service, for whose negligence in the discharge of official duty no action lies against the city, without being expressly given; and the maxim of *respondeat superior* has, therefore, no application."

And many other instances are given by Judge Dillon where a city is not liable for the acts of its agents or servants when acting in a governmental capacity. We are of the opinion, as already intimated, that the city, in constructing and maintaining this work house, was acting in a governmental capacity, acting for the state, for the preservation and maintenance of order, in the punishment of offenders against law; and not acting in its corporate capacity, and that, therefore, that the city is not and was not liable for the acts of the superintendent of the work house, as charged, and that therefore the petition does not state a cause of action against the city.

Coming now to the liability of Mr. Ritter, the superintendent of the work house, it is alleged that the dungeon was damp and unsanitary, and narrow so that the plaintiff was obliged to take an unnatural position; that he was kept in it at one time 48 hours, on another occasion for the same length of time—both times without food, and on a later occasion he was kept in the

dungeon for the period of 144 hours—but it is not alleged that he was kept for that long period without food. And it is claimed that these allegations are sufficient to make a cause of action against Ritter, the superintendent, to constitute a liability against him for his acts and conduct in the performance of his duties as superintendent of the work house. There is no allegation in the petition that Ritter acted maliciously or with an intention to injure Rose; but it is claimed that the facts which are stated are sufficient without any such allegation to constitute a cause of action against him.

The superintendent of a work house is a public officer—an executive officer, perhaps—charged with the government, in a great measure, and the maintenance of good order in the city prison; and in the discharge of these duties he is given, and must be given, a wide discretion. He sits in a quasi-judicial capacity to determine whether a prisoner has violated a rule or regulation of the work house, and if so, what punishment shall be meted out to him. There can be no doubt that wardens of prisons and of penitentiaries and superintendents of work houses have power to order the inmates of such prisons to be punished, when necessary, in some way. It is necessary that good order be preserved in these institutions. Reasonable rules and regulations must be made for the government of the inmates. The statutes provide for reasonable rules and regulations in the government of and the punishments administered in county jails, which are to be submitted to the common pleas judges; and the necessity for such rules and regulations applies with still greater force to work houses such as this, where a large number of prisoners are confined, many of them for long periods of time, where they are compelled to work under the superintendence of officers of the work house as a punishment for criminal offenses. With such a large body of men gathered together in such a prison, reasonable rules and regulations are necessary and it is necessary that these rules and regulations should be enforced, and that the superintendent of such an institution should have the power to punish within reasonable limitations and restrictions. Cruel or excessive punishment should not be administered and are not permitted.

under the Constitution of the state; but whether a man has violated a rule or not is a question to be determined primarily by the superintendent. If he has become unruly and disorderly, what punishment shall be administered must be left to a great extent to the judgment and discretion of the superintendent to determine from the facts of every case and the circumstances surrounding his infraction, together with the general conduct of the inmate while he has been in the institution. It is, we think, a power inherent in such an officer to prescribe reasonable rules and regulations and see that they are obeyed, and that punishments are inflicted for their infraction. It is a power exercised by the officers of prisons everywhere and recognized by the law; a power similar to that exercised by a teacher in a public school, who, in theory, is said to stand in the place of the parent and has power to administer reasonable punishment, and if the punishment is reasonable and fairly in proportion to the offense committed, the teacher is not guilty of any violation of law and can not be convicted of an assault or of assault and battery.

A short case found in 49 Pa. St. Reports, 151 (*Burton* v. *Fulton et al*), is in point. The syllabus, in part, is as follows:

"Public officers acting within the scope of their authority are not answerable in damages for the consequences of their acts unless done maliciously and with an intent to injure."

The liability of public officers is discussed at some length by Judge Cooley in his work on Torts, in the chapter headed "Neglects of Official Duty," beginning on page 375 and running through to page 403. In the first paragraph it is said:

"Although the incumbent of public office has a property right in it, yet the office itself is a public trust, and is conferred, not for his benefit, but for the benefit of the political society. It is therefore from the standpoint of public interest that any failure in duty is to be regarded, and the remedy for such failure must be indicated by the nature of the duty, and the purpose intended to be accomplished in imposing it.

"Official duties are supposed to be susceptible of classification under the three heads of legislative, executive and judicial, corresponding to the three departments of government bearing the same designations; but the classification can not be very exact,

and there are many officers whose duties can not properly, or at least exclusively, be arranged under either of these heads."

And, on page 376, the author says:

"It is, however, as a general thing, only against ministerial officers that an action will lie for neglect of official duty. The reason generally assigned is that in the case of other officers it is inconsistent with the nature of their functions that they should be made to respond in damages for failure in satisfactory performance. In many cases this is a sufficient reason, but in others it is inadequate."

And again, on page 379:

"The rule of official responsibility, then, appears to be this: That if the duty which the official authority imposes upon an officer is a duty to the public, a failure to perform it, or an inadequate or erroneous performance, must be a public, not an individual injury, and must be redressed, if at all, in some form of public prosecution. On the other hand if the duty is a duty to the individual then a neglect to perform it, or to perform it properly, is an individual wrong and may support an individual action for damages."

And the question is discussed further by the author. Now as I have said, there is no allegation in this petition that Ritter acted maliciously or with any intention to injure Rose. The contrary is not averred, and it is to be presumed that Rose was guilty of violation of the rules or regulations of the work house, or he would not have been punished; for it is to be presumed that the superintendent and the authorities of the work house acted reasonably and in accordance with the law and the rules and regulations of the institution in the absence of any allegation to the contrary. It is alleged that he was committed to the dungeon without due process of law and without reasonable or probable cause, but without stating the facts. That is, without any cause that was reasonable in the mind of Rose; still it may have been sufficient in the mind of the superintendent of the work house and sufficient in fact. The plaintiff alleges in his petition as a conclusion that it was without reasonable cause. In our judgment this is not a sufficient allegation to constitute a charge of

violation of official duty against this officer. It does not appear but that Rose's confinement in the work house was dependent entirely upon his willingness to conform to the rules of the institution. It may have been that' he was unwilling to work and was committed to the dungeon until he had indicated a willingness to resume work. It does not appear but that he was informed that whenever he indicated a willingness to resume work that he would be relieved from the dungeon. None of the facts as to the cause of his confinement—the circumstances surrounding the offense with which he was charged—none of these are set forth in the petition. There is no allegation that he had committed no offense. We do not think that the allegation that in the judgment of the plaintiff the cause was insufficient, or unreasonable, is a sufficient statement of fact to constitute a cause of action against the defendant, Ritter. As I have stated, the superintendent must be allowed discretion, and a wide discretion, in matters of this kind. This punishment may have been more severe than would have been inflicted by some other superintendent; it may have been more severe than some jury might think it ought to have been, but that is not sufficient. It is not the law in our judgment that whenever a man is punished in the workhouse, or in the penitentiary, that by filing a petition alleging that he had been punished without reasonable cause, a cause of action is stated against the prison-keeper which would require him to go before a jury and have determined by such jury whether or not he should be made to respond in damages for the punishment of a prisoner committed to his charge

It is said that this dungeon was damp and not sanitary. The petition does not allege that Ritter knew of the condition of the dungeon, but it is alleged that he knew or by reasonable diligence might have known. As we understand it, a dungeon cell is an ordinary appurtenance to a prison of this kind, and it is not improper or unlawful to punish prisoners who have been committed to prison by putting them for a time in the dungeon. Dungeons are not built or constructed entirely according to sanitary principles; they are as a rule somewhat dark and damp; they are not intended as a permanent place of residence for the inmates of the work house, or of any prison, but men are committed to them

a short time for the purpose of punishment, and it is intended to have them so constructed that imprisonment therein will be a punishment; it is not intended to make them a pleasant or agreeable place to stay. The superintendent of the work house was making use of such a prison as he had been put in charge of by the City of Toledo with its various appurtenances. He did not construct the prison; he did not construct the dungeon. The prison had been put in his charge and he was using it in the performance of his duties. The dungeon was a part of the building that he was using, and properly so, as a means of punishment of those confined therein. Punishment by whipping, or other corporal punishments in such institutions, is rather discouraged and discountenanced, and such punishments as keeping men in solitary confinement for a time, or imprisonment in a dungeon for a short period of time, is favored by humanitarians, rather than corporal correction.

We are of the opinion that this petition does not state a cause of action against Mr. Ritter. He was acting in a public official capacity; what he did at the work house was done as a public officer; what he did was for the public. What he did in the way of punishment of prisoners was for the good of the public and the preservation of order and the carrying out of the purposes of the work house rather than on account of any duty that he owed to Mr. Rose or any other inmate of the work house. We think the case is fairly within the rule laid down by the authorities. Facts might be stated that would be of such a character as would make Ritter liable. There might be such facts stated as of themselves would show malice and an intent to do injury without any positive allegation to that effect, but the facts stated in this petition fall short of that; they are not sufficient to show malice on the part of Mr. Ritter, or any intention on his part to do harm to the plaintiff. For these reasons the judgment of the court of common pleas will be affirmed.

*Peter Emslie,* for plaintiff in error.

*M. R. Braily,* City Solicitor, for defendant in error.